**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| GIBBONS FORD, LP on behalf of itself and all others similarly situated, | Civil Case No.: 1:18-cv-05555 |
| Plaintiff, | ANTITRUST CLASS ACTION COMPLAINT |
| vs. | JURY TRIAL DEMANDED |
| GRAY TELEVISION, INC.; HEARST COMMUNICATIONS; NEXSTAR MEDIA GROUP, INC.; TEGNA INC.; TRIBUNE MEDIA COMPANY; and SINCLAIR BROADCAST GROUP, INC., | |
| Defendants. | |

## TABLE OF CONTENTS

Page

NATURE OF ACTION.................................................................................. 1

JURISDICTION AND VENUE .................................................................... 2

PLANTIFF .................................................................................................... 2

DEFENDANTS ............................................................................................ 3

AGENTS AND CO-CONSPIRATORS........................................................ 4

FACTUAL ALLEGATIONS ....................................................................... 5

A.       The Department of Justice Investigation ........................................... 5

B.       The Local Television Advertising Market......................................... 6

       1.     The Structure and Characteristics of The Market For Local Television Advertising Supports The Existence of a Conspiracy ..................................... 11

              a.     The Local Television Industry is Rapidly Consolidating .......... 12

              b.     Several Challenges Restrict Access to the Local Television Market ....................................................................... 13

              c.     Defendants Had Motives and Opportunities To Conspire with Each Other ................................................... 16

CLASS ACTION ALLEGATIONS ........................................................... 22

INTERSTATE TRADE AND COMMERCE .............................................. 24

ACCRUAL OF CLAIM, CONTINUING VIOLATION, EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT................................. 25

PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY ....................... 27

PRAYER FOR RELIEF............................................................................... 30

JURY DEMAND ......................................................................................... 31

Plaintiff Gibbons Ford, LP ("Plaintiff"), individually and on behalf of the Class, as defined below, bring this Class Action Complaint against Defendants Gray Television, Inc.; Hearst Communications; Nexstar Media Group, Inc.; Tegna Inc.; Tribune Media Company; and Sinclair Broadcast Group, Inc. for damages, declaratory, injunctive relief, and other relief pursuant to the federal Sherman Act. Plaintiff demands a trial by jury, and alleges the following based upon information and belief, except as to those allegations that are based on Plaintiff's personal knowledge.

## INTRODUCTION

1.      This antitrust action concerns the illegal and anticompetitive practices of Defendants Gray Television, Inc., Hearst Communications, Nexstar Media Group, Inc., Tegna Inc., Tribune Media Company, and Sinclair Broadcast Group, Inc. (collectively, "Defendants"), who engaged in unlawful collusion and conspired to artificially inflate the price of purchasing local television advertisements in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.      Plaintiff seeks to represent a Class of all persons and entities in the United States who paid for all or a portion of advertisement time on local TV provided by Defendants from at least January 1, 2014, until the effects of their unlawful conduct cease (the "Class Period").

3.      Since at least January 1, 2014, Defendants unlawfully coordinated their efforts to artificially inflate prices for television commercials. Rather than lawfully vying for advertisers through price competition, Defendants and their co-conspirators instead conspired to fix prices by sharing proprietary information, thereby reducing competition in the market.

4.      On July 26, 2018, *The Wall Street Journal* and other media outlets reported that Sinclair Broadcast Group Inc., Tribune Media Co., and certain independent local television stations are the subjects of an ongoing United States Department of Justice

("DOJ") investigation regarding whether communication between the stations' ad sales teams led to higher rates for TV commercials

## JURISDICTION AND VENUE

5.     This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

6.     This Court has jurisdiction over the federal Sherman Act claim pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

7.     Plaintiff seeks to recover damages suffered by the Class and the costs of suit, including reasonable attorneys' fees; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the antitrust laws of the United States.

8.     This Court has personal jurisdiction over Defendants subject to the nationwide service provisions of Section 12 of the Clayton Act, 15 U.S.C. § 22. Furthermore, Defendants have engaged in the unlawful acts described in this Complaint with the foreseeable or intended effect of causing substantial economic harm to purchasers of television advertisements in the state of Illinois.

9.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 28 U.S.C. §§ 15, 22, and 26, and pursuant to 28 U.S.C. § 1391(b), (c), and (d). Defendants are registered to do business, transacted business, were found, and have agents in this District.

10.     Defendants' activities were within the flow of, were intended to, and did have a substantial effect on the interstate commerce of the United States.

## PARTIES

**Plaintiff**

11.     Plaintiff Gibbons Ford, LP is automobile dealership located in Dickson City, PA. During the Class Period, Plaintiff purchased advertisement time directly from one or

more of the Defendants or their co-conspirators and has suffered monetary loss as a result of the antitrust violations alleged herein.

**Defendants**

12.     Defendant Gray Television, Inc. ("Gray") is a television broadcast company headquartered at 4370 Peachtree Road, NE, Suite 400, Atlanta, Georgia 30319. Gray owns and operates television stations and digital assets in the United States. As of February 23, 2018, Gray owned and operated television stations in 57 television markets, broadcasting approximately 200 program streams, including approximately 100 channels affiliated with the CBS Network, the NBC Network, the ABC Network, and the FOX Network. On June 23, 2018, Gray entered into a merger agreement with, among others, Raycom Media, Inc. Giving effect to the merger and prior to divestitures of stations due to market overlaps, Gray expects to own and/or operate 142 full-power television stations serving 92 markets. Upon completion, Gray expects to reach approximately 24 percent of U.S. television households through nearly 400 separate program streams including approximately 165 affiliates of the ABC/NBC/CBS/FOX networks, and over 100 affiliates of the CW, MyNetwork, and MeTV networks.[1]

13.     Defendant Hearst Corporation ("Hearst"), headquartered at 300 West 57th Street, New York, New York 10019, is a diversified media and information Company. Hearst operates television stations and cable networks throughout the United States.

14.     Defendant Nexstar Media Group ("Nexstar"), headquartered at 545 East John Carpenter Freeway, Suite 700, Irving, Texas 75062, operates as a television broadcasting and digital media company in the United States. As of December 31, 2017, the company owned, operated, programmed, or provided sales and other services to 170 television stations in 100 markets.

---

[1] Gray Television Inc, Form 8-K, Press Release, Aug. 7, 2018, available at https://gray.tv/index.php?page=sec-filings (last accessed August 8, 2018).

15.     Defendant Tegna, Inc. ("Tegna") is a broadcasting, digital media, and marketing services company headquartered at 7950 Jones Branch Drive, McLean, Virginia 22107. Tegna owns and operates 47 television stations in 39 markets across the United States.

16.     Defendant Tribune Media Company ("Tribune"), headquartered at 515 North State Street, Chicago, Illinois 60654, operates through its subsidiaries as a media and entertainment company in the United States. It offers news, entertainment, and sports programming through Tribune Broadcasting local television stations, including FOX television affiliates, CW Network television affiliates, CBS television affiliates, ABC television affiliates, MY television affiliates, NBC television affiliates, and independent television stations; and television series and movies on WGN America, a national general entertainment cable network. Tribune owns 43 broadcast television stations in approximately 35 cities.

17.     Defendant Sinclair Broadcast Group., Inc. ("Sinclair"), headquartered at 10706 Beaver Dam Road, Hunt Valley, Maryland 21030, operates as a television broadcast company in the United States. As of December 31, 2017, it owned, operated, and/or provided services to 191 stations in 89 markets, which broadcast 601 channels.

## AGENTS AND CO-CONSPIRATORS

18.     The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

19.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

20.     Each Defendant acted as the principal, agent, or joint venture of, or for, other

Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

**FACTUAL ALLEGATIONS**

**A.       The Department of Justice Investigates Defendants**

21.      On July 26, 2018, *The Wall Street Journal* reported that the Department of Justice is investigating Defendants Sinclair and Tribune, among other local television station owners, to determine if these station owners engaged in unlawful behavior to artificially raise prices for television commercials.[2] Defendants Hearst, Nexstar, and Tegna are also involved in the DOJ probe according to reports.[3] Specifically, the DOJ's investigation targets whether there were "coordinated efforts when [the local television stations'] ad sales teams communicated with each other about their performance, potentially leading to higher rates for TV commercials."[4]

22.      This DOJ investigation grew out of the Justice Department Antitrust Division's earlier examination of Sinclair's proposed $3.9 billion acquisition of Tribune.[5] Despite earlier speculation that the approval was imminent, the Justice Department never approved the merger.[6] In fact, in early July 2018, Federal Communications Chairman Ajit Pai indicated there were "serious concerns" regarding the merger, and issued an order for a hearing on the deal in front of an administrative judge—signaling to many insiders that the proposed merger is dead.[7]

---

[2] Drew FitzGerald & Keach Hagey, *Justice Department Investigates TV Station Owners Over Advertising Sales*, Wall Street Journal (July 26, 2018, 5:38 P.M.) https://www.wsj.com/articles/justice-department-investigates-tv-station-owners-over-advertising-sales-1532633979 (last accessed August 3, 2018).

[3] Eric Mack, *DOJ Probes Sinclair, Other TV Stations for Ad Rate Collusion*, Newsmax (July 26, 2018, 10:06 P.M.), https://www.newsmax.com/newsfront/sinclair-tribune-fcc-ajit-pai/2018/07/26/id/874049/ (last accessed August 3, 2018).

[4] Fitzgerald & Hagey, *supra* note 1.

[5] Ted Johnson, *Justice Department investigating Sinclair, Tribune Media over ad sales communications*, Chicago Tribune (July 27, 2018, 4:37 P.M.), http://www.chicagotribune.com/business/ct-biz-justice-department-sinclair-tribune-media-advertising-20180727-story.html (last accessed August 3, 2018).

[6] *Id.*

[7] Ben Miller, *DOJ investigating if Sinclair, Tribune collude on TV ad sales*, L.A. Biz (July 26, 2018, 4:26 P.M.), https://www.bizjournals.com/losangeles/news/2018/07/26/doj-investigating-if-sinclair-tribune-colluded.html

5

**B.     The Local Television Advertising Market**

23.     In the United States, "local television" is comprised of larger parent companies who own multiple local TV stations. The individual stations carry programming distributed through their broadcast platform, which can be programming provided by national broadcast networks, local news programs, or any variety of other programming.

24.     In 2004, the five largest companies in the local TV market—Sinclair, Nexstar, Gray, Tegna, and Tribune—collectively owned, operated, or serviced 179 full-power stations. In 2014 this number grew to 378, and in 2016 these five companies controlled 443 stations.[8]



25.     Broadcasting companies, such as Defendants, rely on the sale of commercial time on their stations as a vital source of revenue. Local TV station owners attempt to meet the needs of advertisers by delivering to significant audiences in key demographics.

26.     The actual amount of revenue achieved from local TV advertising varies

---

(last accessed August 3, 2018).
[8] Katerina Matsa, *Buying spree brings more local TV stations to fewer big companies*, Pew Research Center (May 11, 2017), http://www.pewresearch.org/fact-tank/2017/05/11/buying-spree-brings-more-local-tv-stations-to-fewer-big-companies/ (last accessed Aug. 3, 2018).

substantially depending a number of variables. One factor that significantly affects revenue is the station's ability to attract and retain local, national, and network advertisers.

27.     The television industry continues to struggle as it adapts to a rapidly changing market of consumers whose media preferences have drifted away from traditional sources and moved toward digital channels. Local TV has been grappling with ratings erosion and "cord-cutting" viewers cancelling their television subscriptions. This continually-shifting landscape has added significant pressure on profit margins.[9]

28.     In recent years, television broadcasting companies have experienced a significant slowing of growth in advertising revenues. But even with this decrease in television advertising spending, total revenue in the U.S. local television industry are



expected to reach $27.7 billion in 2018, up from $26.2 billion in 2017.[10]

29.     Given the stalled growth in spending on television advertising, Defendants

---

[9] Cynthia Littleton, *Local TV Feels Squeeze Amid Station Consolidation,* Variety (July 25, 2017, 4:16 P.M.), https://variety.com/2017/tv/news/local-news-sinclair-tribune-nexstar-deal-1202506598/ (last accessed August 3, 2018).

[10] *BIA/Kelsey Reports Local Television Station Revenue Reached $28.4 B in 2016; Retransmission Fees, Over-the-Air and Digital Revenue Contribute to a Strong Year*, BIA Advisory Services (Apr. 20, 2017), http://www.biakelsey.com/biakelsey-reports-local-television-station-revenue-reached-28-4-b-2016-retransmission-fees-air-digital-revenues-contribute-strong-year/ (last accessed August 3, 2018).

responded to these lackluster advertisement sales through unlawfully colluding on pricing, thereby forcing Plaintiff and members of the Class to pay artificially high prices for advertising on local television.

1. **The Structure and Characteristics of The Market For Local Television Advertising Supports The Existence of a Conspiracy**

30. The structure and other characteristics of the market for local television advertising make it conducive to anticompetitive conduct among Defendants and make collusion particularly attractive. Specifically, the local television advertising market (1) is in an industry that has been rapidly consolidating and is becoming increasingly concentrated; (2) has high barriers to entry; and (3) is comprised of participants who had motives and ample opportunities to conspire.

a. **Rapid Consolidation of the Local TV Market**

31. The more highly-concentrated a market is, the more susceptible it is to collusion. The local tv market has undergone a period of rapid concentration in recent years, in response to advertisers' decreased spending.[11]

32. The year 2013 marked a massive change in local television, when "big owners of local TV stations got substantially bigger, thanks to a wave of station purchases."[12]

33. Owners of stations have not shied away regarding their intent to push consolidation as far as possible. In early 2018, local television station owner E.W. Scripps Co., indicated that its "priority is in-market consolidation to create duopolies."[13]

---

[11] *See* G. Mann, F. Venturini, & E. Malhotra, *The Future of Broadcasting V*, ACCENTURE (2016), *available at* https://www.accenture.com/t20170411T172611Z__w__/us-en/_acnmedia/Accenture/next-gen/pulse-of-media/pdf/Accenture_Future_of_Broadcast_V_POV.pdf (last accessed Aug. 3, 2018).

[12] Deborah Potter & Katerina Matsa, *A Boom in Acquisitions and Content Sharing Shapes Local TV News in 2013*, Pew Research Center (Mar. 26, 2014), http://www.journalism.org/2014/03/26/a-boom-in-acquisitions-and-content-sharing-shapes-local-tv-news-in-2013/ (last accessed August 3, 2018).

[13] *More TV Consolidation Ahead As Major Players Plot Merger Plans,* Inside Radio (Feb. 6, 2018), http://www.insideradio.com/free/more-tv-consolidation-ahead-as-major-players-plot-merger-plans/article_916a7dd8-0b0e-11e8-81c3-1b954ca8a63e.html (last accessed August 3, 2018).

34.     Additional proposed mergers, if completed, will further concentrate the market. On June 25, 2018, Defendant Gray agreed to buy fellow television station owner Raycom Media Inc. in a $3.65 billion deal that would create a company that doubles Gray's reach to nearly a quarter of U.S. TV households.[14]

### b.     Barriers to Entry in the Local Television Market

35.     If parties engage in an arrangement that elevates the prices of a product above competitive levels, this should in typical circumstances attract new competitors to enter the market, seeking to fill the price gap and benefit from supracompetitive pricing. However, when barriers to entry are high, new entrants are far less likely to enter the market. Barriers to entry help in the formation and maintenance of cartels and market-allocation agreements, as has happened in the local television market.

36.     Although certain specific barriers to market entry have been lowered through the expansion and advancement of technology, new entrants to the broadcasting markets face six critical barriers, including: governmental policy; the presence of dominant broadcasters; access to content; audience behavior; consumer costs; and capital requirements.[15]

37.     Regulatory and/or administrative practices by the government when issuing broadcasting licenses may restrict market access and distort competition.

38.     The existing power structure of dominant broadcasters also proves to be a barrier to entry. These dominant broadcasters have long-established relationships with their viewers—and most likely also hold sway with advertisers. Any potential entrants in the market would have to offer more compelling deals than the existing broadcasters in order to gain market share.

---

[14] *Gray TV to Buy Raycom in $3.65 Billion Deal*, Reuters (June 25, 2018, 6:37 A.M.), https://www.reuters.com/article/us-raycom-m-a-gray-television/gray-television-to-buy-raycom-media-in-3-65-billion-deal-idUSKBN1JL1A1 (last accessed August 3, 2018).
[15] Robert G. Picard & Bum Soo Chon, *Managing Competition Through Barriers to Entry and Channel Availability in the Changing Regulatory Environment*, 6 The Int'l J. on Media Mgmt. 168, 170 (2010).

39.     Larger companies are also better able to negotiate programming deals with networks or syndicators, whereas a newer entrant to the market would be required to invest significant capital and time in establishing itself before it could work with networks.

40.     Reasonably-priced access to desired programming is yet another barrier. Content acquisition, which is critical to pull in viewers, constitutes a significant cost to new market competitors.

41.     Commercial broadcasters' operations are primarily financed through advertising fees, so it is by necessity that they locate and retain an audience base that will also attract a sufficient number of advertisers. Therefore, these new broadcasters in the market would face the difficult task of providing programming compelling enough to convince viewers to change their viewing and channel habits.

42.     The cost and inconvenience encountered by customers who try switching between different television broadcasters has the potential to discourage them from altering their established patterns of viewing. As one example, a consumer switching cable providers might face costs of replacing the set-top boxes or might have to trade in and upgrade equipment.

43.     Finally, it would require considerable capital to break into the local television market. The total expense, time, and technical sophistication for a potential competitor to access the economies of scale and the audience base already obtained by Defendants would be immense. To the extent these costs are prohibitively high, they constitute a serious entry barrier.

          c.      **Defendants Had Motives and Opportunities to Conspire with Each Other**

44.     In 2017, television advertising sales in the U.S. saw the steepest drop outside of a recession in at least 20 years, while the sales at cable networks dropped for the first

time in almost a decade.[16] Industry specialists do not predict any rebound or pickup in 2018, excluding huge, cyclical events like the Olympics and the midterm elections.

45. The online video advertising market is gaining momentum as the decline in television viewership dips even further down. Virtually all new advertising money entering the marketplace goes toward online advertising, and nearly half of the growth in local video ad spending during the next five years will go to digital platforms. "Television ad sales have fallen even as global advertising grows, leading research firms and analysts to predict that the business may never recover."[17]

46. Sinclair's financial statements reveal the same story. According to Sinclair's most recent 10-K, one primary source of revenue for local television stations is selling commercial inventory on its television stations to advertising customers.[18] Sinclair also admits to the volatility of such a system, pointing to the uncertainty of revenue potentially affecting operating results and its ability to repay its indebtedness.[19]

47. Given that Defendants' business model depends to a large extent on the revenue from local television advertising to sustain daily operations, in the face of declining sales, Defendants had good reason and sufficient motivation to conspire to artificially raise the prices of local TV advertisements.

48. There were abundant opportunities for Defendants to meet and conspire with each other under the guise of legitimate business contacts and to perform acts necessary for the operation and furtherance of the conspiracy.

49. For example, in 2013, when nearly 300 full-power local TV stations were

---

[16] Lucas Shaw, Advertisers Tuning Out TV in Sign of Trouble for Media Companies, Bloomberg, Feb. 14, 2018, available at https://www.bloomberg.com/news/articles/2018-02-14/advertisers-tuning-out-tv-in-sign-of-trouble-for-media-companies (last accessed August 3, 2018).
[17] Id.
[18] Sinclair Broadcast Group Inc, Form 10-K, EDGARPRO, Mar. 1, 2018, available at https://www.sec.gov/cgi-bin/browse-edgar?company=Sinclair+Broadcast+Group+Inc&owner=exclude&action=getcompany (last accessed August 3, 2018) at p. 5.
[19] Id., at p. 21.

changing hands, many deals resulted in stations in the same market being jointly operated in practice, but separately owned on paper, a practice that has seen explosive growth in recent years.[20] As of 2014, joint service agreements existed between Defendants and other local TV station owners in a minimum of 94 markets—almost half of the 210 local television markets nationwide—up from merely 55 in 2011.[21]

50.     Sinclair has admitted that some of its stations "entered into agreements with other stations in the same market, through which [it] provide[s] programming and operating services[,] . . . sales services[,] and other non-programming operating services."[22]

51.     Industry associations such as the Television Bureau of Advertising, Inc. ("TVB"), the National Association of Broadcasters ("NAB"), and the Media Rating Council ("MRC"), all gave Defendants additional ample opportunity to engage in unlawful collusion, through conferences and meetings held by those associations, as well as part of merger negotiations.

52.     The industry trade association TVB—which includes Defendants Hearst, Nexstar, Sinclair, Tegna, and Tribune—is a "not-for-profit trade association representing America's $21 billion local broadcast television industry." TVB encourages information sharing among employees of broadcast television companies, including Defendants, especially advertising sales representatives.[23] Nexstar's President and CEO serves as the Chairman of TVB.

53.     On November 20, 2017, Defendants Hearst, Nexstar, Sinclair, Tegna, and Tribune announced the creation of the TV Interface Practices or "TIP" Initiative—"an

---

[20] D. Potter & K. Matsa, A Boom in Acquisitions and Content Sharing Shapes Local TV News in 2013, PEW RESEARCH CENTER, available http://www.journalism.org/2014/03/26/a-boom-in-acquisitions-and-content-sharing-shapes-local-tv-news-in-2013/ (last accessed August 3, 2018).
[21] Id.
[22] Sinclair Broadcast Group Inc, Form 10-K, EDGARPRO, Mar. 1, 2018, available at https://www.sec.gov/cgi-bin/browse-edgar?company=Sinclair+Broadcast+Group+Inc&owner=exclude&action=getcompany (last accessed August 3, 2018) at p. 16.
[23] About TVB, TVB, available at https://www.tvb.org/AboutTVB.aspx (last accessed August 3, 2018).

industry work group dedicated to developing standard-based interfaces to accelerate electronic advertising transactions for local TV broadcasters and their media agency partners."[24] On the heels of this announcement, three Defendant-executives made the following, similar public statements: Nexstar's President and CEO stated that the industry "must work together as an industry"[25]; Sinclair's President and CEO, Chris Ripley, stated "[t]he TIP Initiative demonstrates the industry's shared commitment to working together" to grow their advertising sales[26]; and Tribune's President and CEO, Larry Wert, indicated that, through the TIP Initiative, Defendants could "actively work[] together."[27]

54.     Sinclair, Tribune, and other broadcast television companies are also members of the NAB, the self-described "premier trade association for broadcasters."[28] Tegna's President and CEO, David Lougee, and Hearst's President, Jordan Wertlieb, both serve on NAB's Executive Committee.[29] Gray TV's Chairman, President, and CEO, Hilton Howell, Nexstar's Chairman, President and CEO, Perry Sook, Sinclair's President and CEO, Chris Ripley, and Tribune's COO, Kathy Clements, all serve on the NAB Television Board of Directors.[30] NAB hosts numerous meetings and other events for industry members throughout the year, which are attended by Defendants' executives.

55.     Gray TV, Hearst, Nexstar, Sinclair, Tegna, Tribune, and several other local television station owners are also members of MRC,[31] which boasts that one of the "[b]enefits of MRC [m]embership" is that "[m]embers are exposed to other members' ideas

---

[24] Local Television Broadcasters' TIP (TV Interface Practices) Initiative to Accelerate Electronic Workflow for TV Advertising Transactions, BUSINESS WIRE, Nov. 20, 2017, available at https://www.businesswire.com/news/home/20171120005141/en/Local-Television-Broadcasters%E2%80%99-TIP-TV-Interface-Practices (last accessed August 3, 2018).
[25] Id.
[26] Id.
[27] Id.
[28] About Us, NAB, https://www.nab.org/about/default.asp (last accessed August 3, 2018).
[29] NAB Board of Directors, NAB, https://www.nab.org/about/nabBoard.asp (last accessed July 29, 2018).
[30] Id.
[31] 2018 Membership, MEDIA RATING COUNCIL, available at http://mediaratingcouncil.org/Member%20Companies.htm (last accessed August 3, 2018).

and thoughts" and that "[m]embers can attend formal education seminars" together.[32]

## CLASS ACTION ALLEGATIONS

56.     Plaintiff brings this action on behalf of itself and as a class action under Rule

23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following

class (the "Class"):

> All persons and entities in the United States who paid for all or a
> portion of the cost of advertisement time directly to Defendants, or
> any current or former subsidiary or affiliate of Defendants, or any
> co-conspirator, during the period from at least and including
> January 1, 2014 until the effects of Defendants' unlawful conduct
> ceases. Excluded from the Class are Defendants, their parent
> companies, subsidiaries, affiliates, agents, co-conspirators, federal
> governmental entities and instrumentalities of the federal
> government, and states and their subdivisions, agencies and
> instrumentalities.

57.     **Numerosity**. While Plaintiff does not know the exact number of members of

the Class, Plaintiff believes the class size is numerous given Defendants' substantial

nationwide presence.

58.     **Commonality**. Common questions of law and fact exist as to all members of

the Class. This is particularly true given the nature of Defendants' unlawful anticompetitive

conduct, which was generally applicable to all the members of the Class, thereby making

class-wide relief appropriate. Such questions of law and fact common to the Class include,

but are not limited to:

(a)     Whether Defendants and their co-conspirators engaged in a combination and

conspiracy among themselves to restrict output and fix, raise, maintain or

stabilize the prices of local television advertising time;

(b)     The identity of the participants of the alleged conspiracy;

(c)     The duration of the alleged conspiracy;

---

[32] The Benefits of MRC Membership, MEDIA RATING COUNCIL, http://mediaratingcouncil.org/Benefits.htm (last accessed August 3, 2018).

(d)     The acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(e)     Whether the alleged conspiracy violated Section 1 of the Sherman Act;

(f)     Whether the conduct of Defendants and their co-conspirators as alleged in this Complaint caused injury to the business or property of Plaintiff and the members of the Class;

(g)     The effect of the alleged conspiracy on the cost of local television advertising time during the Class Period;

(h)     Whether the Defendants and their co-conspirators fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the members of the Class;

(i)     The appropriate injunctive and related equitable relief for Plaintiff and the Class; and

(j)     The appropriate class-wide measure of damages.

59.     **Typicality**. Plaintiff's claims are typical of the claims of the members of the Class, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for local television advertising time provided by Defendants and/or their co-conspirators.

60.     **Adequacy**. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by competent counsel who are experienced in the prosecution of antitrust and class action litigation.

61.     **Predominance**. The questions of law and fact common to the members of

the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

62. **Superiority**. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

63. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## INTERSTATE TRADE AND COMMERCE

64. Billions of dollars of transactions in local television advertisements are entered into each year in interstate commerce in the United States and the payments for those transactions flowed in interstate commerce.

65. Defendants' manipulation of the market for the sale of local television advertising had a direct, substantial, and foreseeable impact on interstate commerce in the United States.

66. Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for local television advertising.

16

67. Defendants' unlawful conduct has a direct and adverse impact on competition in the United States. Absent Defendants' combination, conspiracy, and/or agreement to manipulate the market for the sale of local television advertising, the prices of local television advertising would have been determined by a competitive, efficient market.

## FRAUDULENT CONCEALMENT

68. Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of their unlawful conduct, including their collusion to fix, maintain, stabilize, and/or artificially inflate prices for television advertising. The very nature of Defendants' conspiracy was secret and self-concealing. Defendants engaged in market manipulation that could not be detected by Plaintiff and members of the Class.

69. Throughout the Class Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their price-fixing conspiracy.

70. Plaintiff and members of the Class did not know of any facts that would have caused a reasonable person to suspect that Defendants and their co-conspirators were colluding to fix, maintain, stabilize, and/or artificially inflate prices for television advertising.

71. Plaintiff and the Class members did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein prior to *The Wall Street Journal*'s disclosure of the DOJ investigation of Defendants and their co-conspirators on July 26, 2018.

72. As alleged herein, Defendants' collusion to fix prices in the market for the sale of local television advertising was material to Plaintiff and Class members at all relevant times. Plaintiff or the Class members could not have discovered the violations until shortly before this litigation was commenced because Defendants and their co-conspirators used, and continue to use, deceptive methods to avoid detection and to affirmatively conceal their violations.

73.     Plaintiff and Class members reasonably relied on Defendants' knowing, active, and affirmative concealment. As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiff's and the Class members' claims have been tolled.

## PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY

74.     Plaintiff and Class members purchased television advertising time from one or more Defendants or their co-conspirators in the United States.

75.     Sinclair and Tribune are horizontal competitors in the market for the sale of television advertising in the United States. Together, the media companies reach more than 80% of households in the United States.

76.     Rather than compete on price as horizontal competitors would in an unrestrained market, Defendants intended to restrain trade, and actually did restrain trade, through their common scheme to achieve their unlawful purpose and objective of inflating, fixing, stabilizing, and/or maintaining advertising rates.

77.     There is no legitimate business justification for, or procompetitive benefits of, Defendants' unreasonable restraint of trade.

78.     Defendants' antitrust conspiracy, conspiracy to monopolize, attempted monopolization, and monopolization had the following effects, among others:

(a)     Price competition has been restrained or eliminated with respect to local television advertising;

(b)     The prices of local television advertising have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)     Plaintiff and Class members—purchasers of local television advertising time—have been deprived of the benefits of free and open competition; and

(d)     Plaintiff and Class members—purchasers of local television advertising

time—paid artificially inflated prices.

79.     Absent Defendants' and their co-conspirators' collusion, those purchasing television advertising would have transacted at competitive prices and reaped the benefits of competition.

80.     The precise amount of the overcharge impacting the prices of local television advertising time paid by Plaintiff and the Class can be measured and quantified using well-accepted models.

81.     As a direct, intended, foreseeable, and proximate result of Defendants' unlawful conspiracy and acts in furtherance of their conspiracy, Plaintiff and the members of the Class have sustained injury to their businesses or property, having paid higher prices for local television advertising time than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

**COUNT ONE**
**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
**(Conspiracy in Restraint of Trade)**

82.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

83.     From at least January 1, 2014, until the effects of their unlawful conduct ceases, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy with regards to local television advertising in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

84.     The contract, combination or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize or maintain at artificially high levels the prices they charged for local television advertising time in the United States.

85.     In formulating and effectuating this conspiracy, Defendants and their co-

19

conspirators did those things that they combined and conspired to do, including:

(a)     participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, increase, maintain, or stabilize prices of local television advertisements in the United States; and

(b)     participating in meetings and conversations among themselves to implement, adhere, and police the agreements they reached.

86.     Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, raise, or stabilize prices of local television advertising time.

87.     Defendants' conspiracy had the following effects, among others:

(a)     Price competition in the market for local television advertisements has been restrained, suppressed, and/or eliminated;

(b)     Prices for local television advertisement time provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)     Plaintiff and Class members who purchased local television advertisement time from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

88.     Plaintiff and Class members have been injured and will continue to be injured in their business and property by paying more for local television advertising time purchased from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

89.     The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

90.     Plaintiff and Class members are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and the Class respectfully request the following relief:

A.     That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.     The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.     The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination allege herein, or from entering into any other contract, conspiracy, or combination having  a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or  effect;

D.     That Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

E.      That each of the Defendants, and their respective successors, assigns, parent, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concerted action as alleged herein; and

F.      That the Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## **JURY DEMAND**

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.


Dated: August 14, 2018                              Respectfully submitted,

                                    /s/ Kenneth A. Wexler
                                    Kenneth A. Wexler
                                    Bethany R. Turke
                                    Justin N. Boley
                                    **WEXLER WALLACE LLP**
                                    55 West Monroe St., Suite 3300
                                    Chicago, IL 60603
                                    Tel: (312) 346-2222
                                    kaw@wexlerwallace.com
                                    brt@wexlerwallace.com
                                    jnb@wexlerwallace.com

                                    Simon Bahne Paris
                                    Patrick Howard
                                    Charles J. Kocher
                                    **SALTZ, MONGELUZZI, BARRETT &
                                    BENDESKY, P.C.**
                                    One Liberty Place, 52nd Floor
                                    1650 Market Street
                                    Philadelphia, PA 19103
                                    Telephone: (215) 575-3986

Facsimile: (215) 496-0999
sparis@smbb.com
phoward@smbb.com

Anthony D. Shapiro
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: tony@hbsslaw.com

*Counsel for Plaintiff and the Proposed Class*